**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| STEPHEN LEHMANN | : | CIVIL ACTION |
| | : | |
| v. | : | NO.  21-4626 |
| | : | |
| LOUISVILLE LADDER INC. | : | |

## MEMORANDUM

KEARNEY, J.                                                                July 6, 2022

Stephen Lehmann fell through a mobile scaffold while installing drywall in an office. He allegedly suffered injuries which he attributes to the defective design of the mobile scaffold and the scaffold manufacturer's failure to warn about the latch pins on the sides of the scaffold securing the platform. He claims the scaffold's defective design or the manufacturer's failure to warn caused him injury warranting damages.

Mr. Lehmann and the scaffold manufacturer Louisville Ladder Inc. each move to preclude identified trial evidence. The parties present different views on developing authority on whether the manufacturer can show industry standards evidence. The parties also seek to preclude evidence of: competitors selling differently designed scaffolds, non-compliance with an ethical standard known as the "hierarchy of safety," Mr. Lehmann's conduct assembling the scaffold shortly before the accident, other accidents involving mobile scaffolds, and the alleged non-existence of accidents with this scaffold. We carefully studied the extensive briefing. We today find Louisville Ladder may introduce the competitor products survey. We find evidence of Mr. Lehmann's pre-accident conduct is admissible only for purposes of his failure-to-warn theory of liability. Mr. Lehmann may introduce evidence of competitors selling differently designed scaffolds. We preclude the evidence on the presence or absence of other accidents, a "hierarchy of safety" ethics standard,

and Mr. Lehmann's alleged negligent conduct in assembling the scaffold shortly before the accident for purposes of his design defect claim.

## I.    Background

Stephen Lehmann fell through a defective baker scaffold manufactured by Louisville Ladder while installing drywall framing on the ninth floor of a Philadelphia construction site.[1] A "baker scaffold" is a platform affixed between two end frames which look like miniature ladders:[2]



The user of an ST0606A scaffold can adjust the height platform in two-inch increments by dislodging spring pins in the side frame of the scaffold, moving the platform as desired, then relodging the pins into holes along the side frames.[3] The user can then lock the platform into the desired position by rotating latch pins on opposite sides of the platform into place.[4]

Mr. Lehmann stood on Louisville Ladder's model ST06006A scaffold while installing drywall.[5] Mr. Lehmann alleges the latch pins became dislodged while he stood on it.[6] He alleges the platform then became dislodged from the side frames, causing it to fall to the ground.[7] Mr. Lehmann alleges he fractured his calcaneus and his tissue swelled over his left ankle, requiring surgery and other medical procedures.[8]

Mr. Lehmann sues Louisville Ladder for strict products liability.[9] Mr. Lehmann claims defective design, failure-to-warn, and manufacturing defect theories.[10] Mr. Lehmann argues the ST0606A scaffold is defective under a design defect theory because the scaffold's latch pins "can and do rotate to the point where they are useless during foreseeable use of the scaffold."[11] Mr. Lehmann argues Louisville Ladder failed to warn the scaffold's users about the product's dangers, "including the fact that the platform latch pins can rotate out of position during foreseeable use."[12] Mr. Lehmann argues the accident would not have occurred had Louisville Ladder warned users to check the latch pins before each use.[13] Mr. Lehmann does not explain his manufacturing defect theory and we are proceeding on a design defect and failure-to-warn analysis today.

## II.    Analysis

Mr. Lehmann and Louisville Ladder each move *in limine* to preclude three pieces of evidence. Mr. Lehmann asks we exclude evidence of: the scaffold's compliance with industry standards, his own conduct shortly before the fall as evidence of his negligence, and the absence of earlier accidents involving the scaffold.[14] Louisville Ladder asks we exclude evidence of: the scaffold's purported non-compliance with the "hierarchy of safety," Louisville Ladder's competitors selling differently designed scaffolds, and other accidents involving baker scaffolds.[15]

We begin with relevant strict liability principles. Pennsylvania follows section 402A of the Second Restatement of Torts.[16] Mr. Lehmann must prove Louisville Ladder's scaffold "was defective, the defect existed when it left the defendant's hands, and the defect caused the harm."[17] Mr. Lehmann may prove the scaffold's defective condition by satisfying one of two tests under Pennsylvania law: the consumer expectations test or the risk-utility test.[18] A product fails the consumer expectations test if Mr. Lehmann proves "the danger is unknowable and unacceptable to the average or ordinary consumer."[19] A product fails the risk-utility test if "a reasonable person

would conclude that the probability and seriousness of harm caused by the product outweigh the burden or costs of taking precautions."[20]

We then apply these principles to the challenged evidence. First, we admit evidence of a competitor products survey which Louisville Ladder argues demonstrates the scaffold's compliance with industry standards. Second, we admit evidence of Mr. Lehmann's conduct shortly before the fall (what Louisville Ladder may characterize as his negligence) for the limited purpose of his failure-to-warn theory of strict liability but not for his design defect theories. Third, we admit evidence Louisville Ladder's competitors sold differently designed scaffolds. Fourth, we exclude evidence of the scaffold's non-compliance with the "hierarchy of safety." Fifth, we exclude evidence of previous accidents involving the same or similar scaffolds because Mr. Lehmann does not establish the appropriate foundation. Sixth, we exclude evidence of the absence of earlier accidents involving the same scaffold because Louisville Ladder does not establish the appropriate foundation.

### A.  We admit evidence of the scaffold's compliance with industry standards.

Louisville Ladder proffers a "competitor products survey" which analyzes scaffolds similar to its ST0606A scaffold, the weight they can bear, their component parts, and their prices.[21] Mr. Lehmann moves to exclude the evidence arguing this type of industry standards evidence is not relevant to a products liability claim.[22] "Industry standards" evidence is, as the name suggests, evidence showing what standards manufacturers in the subject industry follow.[23] The parties agree the competitor product survey constitutes industry standards evidence, but they disagree as to its relevance. Louisville Ladder argues the Pennsylvania Supreme Court recognized the relevance of industry standards evidence eight years ago in *Tincher v. Omega Flex, Inc.*[24] Mr. Lehmann argues we should instead follow the 2021 Pennsylvania Superior Court's holding in *Sullivan v. Werner Co.*[25] barring industry standards evidence in another strict liability case involving a fall from a

4

scaffold. But the Superior Court will not have the final word as the Pennsylvania Supreme Court recently exercised its discretion to accept an appeal of this evidentiary decision and the parties are briefing these issues this summer.[26] Our analysis of the precedent firmly persuades us to admit this type of competitor products survey evidence relevant to the risk-utility test established by the Pennsylvania Supreme Court in *Tincher.*

Our analysis entails four parts. First, we explain the uncertain status of admitting industry standards evidence under Pennsylvania law. Second, we explain the Federal Rules of Evidence control our analysis, but still require us to predict whether the Pennsylvania Supreme Court will overrule its bar on industry standards evidence. Third, we predict the Pennsylvania Supreme Court will overrule its categorical bar on industry standards evidence. Fourth, we explain the relevance of the proffered industry standards evidence in Mr. Lehmann's strict liability claim.

### 1. The admissibility of industry standards evidence remains unclear in Pennsylvania.

The admissibility of "industry standards" evidence has followed a "long and winding road" through Pennsylvania's state and federal courts.[27] We must briefly detail this road before explaining why we find the evidence admissible. Four Pennsylvania cases provide guideposts along the road: *Azzarello v. Black Bros. Co., Inc.*; *Lewis v. Coffing Hoist Division, Duff-Norton Co., Inc.*; *Tincher v. Omega Flex, Inc.*; and *Sullivan v. Werner Co.*

#### i. *Azzarello v. Black Bros. Co., Inc.*

Pennsylvania courts once followed an "idiosyncratic, 'super' strict liability approach"[28] to products liability created by the Pennsylvania Supreme Court's 1978 case *Azzarello v. Black Bros. Co., Inc.*[29] interpreting section 402A of the Second Restatement. The Pennsylvania Supreme Court in *Azzarello* "created a distinct divide between strict liability and negligence claims, by suggesting that negligence concepts have no place in Pennsylvania strict liability doctrine."[30] The

Pennsylvania Supreme Court held "the jury may find a defect where the product left the supplier's control lacking any element necessary to make it safe for its intended use or possessing any feature that renders it unsafe for the intended use."[31] But the jury could not consider negligence principles in making its findings. The Pennsylvania Supreme Court in *Azzarello* barred using "the term 'unreasonably dangerous'" in jury instructions of strict products liability cases because the term "mislead[s]" juries into thinking negligence governs strict liability cases.[32] As the Supreme Court later found, *Azzarello* held "***any*** negligence rhetoric carries an undue risk of misleading lay jurors in strict liability cases."[33] The court in *Azzarello* required judges to determine if a product "was 'unreasonably dangerous'" before submitting the case to the jury; then, the jury would decide if the product lacked any element necessary for its safe use.[34]

### ii. *Lewis v. Coffing Hoist Division, Duff-Norton Co., Inc.*

*Azzarello*'s exclusion of negligence principles from strict liability cases later caused the exclusion of "industry standards" evidence from products liability cases. In *Lewis v. Coffing Hoist Division, Duff-Norton Co., Inc.*,[35] the Pennsylvania Supreme Court affirmed the trial court's exclusion of industry standards evidence because it proves "the reasonableness of the [manufacturer's] conduct in making its design choice."[36] Focus on the manufacturer's design choice would "improperly" introduce "concepts of negligence law" into a strict liability action.[37] This focus violated *Azzarello*'s mandate—as interpreted by *Lewis*— "negligence concepts have no place in a case based on strict liability."[38] The evidence "would have created a strong likelihood of diverting the jury's attention from the [product] to the reasonableness of the [manufacturer's] conduct in choosing its design," further frustrating *Azzarello*'s goal of avoiding misleading the jury with negligence concepts.[39]

### iii.  *Tincher v. Omega Flex, Inc.*

The Pennsylvania Supreme Court cast substantial doubt upon *Lewis*'s viability by overruling *Azzarello* in its seminal 2014 decision *Tincher v. Omega Flex, Inc.*[40] In *Tincher*, the Supreme Court abandoned *Azzarello*'s "super" strict liability approach and exile of negligence principles. The court rejected *Azzarello*'s treatment of the term "unreasonably dangerous" as carrying "dogmatic[] significance."[41] The court explained *Azzarello* erred by crafting a broad legal standard from a "distinct, fact-bound context" of a confusing jury trial.[42] The court's previous exile of negligence rhetoric from strict liability cases "perpetuated jury confusion . . . rather than dissipating it."[43] The court in *Azzarello* created an "impracticable" standard by making a jury determine a product's defectiveness without hearing evidence whether the product is unreasonably dangerous—even though a product is defective if it ***is*** unreasonably dangerous.[44]

The Pennsylvania Supreme Court accordingly discarded its thirty-six-year-old reasoning in *Azzarello* dividing the defectiveness inquiry between judge and jury. The court provided a new framework for establishing a product's defectiveness, adopting two tests to measure defectiveness: the consumer expectations test and the risk-utility test.[45]

The consumer expectations test measures "the competing interests of consumers and sellers . . . from the perspective of the reasonable consumer."[46] A product violates the consumer expectations test if it is "dangerous beyond the reasonable consumer's contemplations."[47] "[T]he product is in a defective condition if the danger is unknowable and unacceptable to the average or ordinary consumer."[48]

The risk-utility test articulates the balancing of seller's interests versus consumer's interests "more from the perspective of the reasonable seller."[49] The risk-utility test "offers courts an opportunity to analyze *post hoc* whether a manufacturer's conduct in manufacturing or designing a product was reasonable."[50] The test "obviously reflects the negligence roots of strict liability."[51]

The Pennsylvania Supreme Court provided seven factors relevant to the risk-utility calculus:

(1) The usefulness and desirability of the product—its utility to the user and to the public as a whole.

(2) The safety aspects of the product—the likelihood that it will cause injury, and the probable seriousness of the injury.

(3) The availability of a substitute product which would meet the same need and not be as unsafe.

(4) The manufacturer's ability to eliminate the unsafe character of the product without impairing its usefulness or making it too expensive to maintain its utility.

(5) The user's ability to avoid danger by the exercise of care in the use of the product.

(6) The user's anticipated awareness of the dangers inherent in the product and their availability, because of general public knowledge of the obvious condition of the product, or of the existence of suitable warnings or instructions.

(7) The feasibility, on the part of the manufacturer, of spreading the loss by setting the price of the product or carrying liability insurance.[52]

The Pennsylvania Supreme Court finished *Tincher* by recognizing overruling *Azzarello* could affect decisions based on *Azzarello*, "such as the availability of negligence-derived defenses."[53] The court did not opine as to how its decision in *Tincher* could affect those defenses. The court in *Tincher* discussed *Lewis*, characterizing it as a case "reflect[ing] an increasing concern with segregating strict liability and negligence concepts."[54] But the court in *Tincher* did not expressly overrule *Lewis*.

### iv. *Sullivan v. Werner Co.*

Pennsylvania's state and federal courts following *Tincher* wrestled with whether Pennsylvania law would now allow trial judges to admit industry standards evidence.[55] The Pennsylvania Superior Court in 2016 found *Tincher* did not provide "a sufficient basis" to "disregard[]" *Lewis*.[56] But our learned colleague Judge Pappert in 2017 admitted industry

standards evidence.[57] And our learned colleague Judge Mariani admitted a defendant's industry standards evidence only as conditionally relevant if the plaintiff opened the door by adducing evidence a product did not comply with industry standards.[58]

The Pennsylvania Superior Court returned to this admissibility issue almost fifteen months ago in *Sullivan v. Werner Co.*,[59] holding industry standards evidence remains inadmissible in strict liability cases.[60] The court in *Sullivan* analyzed the admissibility of industry standards evidence regarding a strict liability claim involving a defective mobile scaffold as here.[61] The Superior Court affirmed Judge Erdos's exclusion of industry standards evidence under *Tincher*. The Superior Court reasoned *Tincher* affirmed strict liability and remains Pennsylvania law, finding "a product can be designed and manufactured with 'all possible care' but still be defective."[62] The Superior Court reasoned evidence showing a manufacturer complied with industry standards goes to the issue of whether the manufacturer exercised due care in manufacturing the product—an irrelevant defense in a strict liability regime.[63]

The Superior Court recognized the Pennsylvania Supreme Court in *Tincher* "cast some doubt" upon *Lewis*'s "evidentiary prohibition" against industry standards evidence.[64] But the Superior Court still found industry standards remains irrelevant because it proves "the reasonableness of the manufacturer's conduct in designing or manufacturing the product," an irrelevant concept under *Tincher*.[65] The court reasoned admitting industry standards evidence would violate Pennsylvania's strict liability regime by questioning "whether the manufacturer could have reasonably foreseen the risks of the product."[66] The Superior Court agreed with the analysis of Professors Ellen Wertheimer and Mark Rahdert rejecting industry standard defenses because such defenses "boil[] down to an assertion by the defendant roughly to this effect: 'Sure, the product may be dangerous, but we did everything we reasonably could to make it safe,

everything that was done by other manufacturers/distributors in our industry. Our product was as good as it could be given the state of the art at the time.'"[67] Professors Wertheimer and Rahdert theorized "[t]his is a due care defense, pure and simple, and it sounds in negligence."[68] The court in *Sullivan* adopted the professors' theory, concluding industry standards "do not go to the safety of the product itself but to the manufacturers' 'possible care in preparation of product,' which is irrelevant to whether a product is unsafe or strict liability is established."[69]

Judges in our Circuit followed *Sullivan*.[70] But the Pennsylvania Supreme Court recently granted a petition for appeal of the *Sullivan* decision.[71] The Supreme Court will decide whether the Superior Court in *Sullivan* erred by affirming Judge Erdos's exclusion of evidence of "the product's compliance with pertinent industry and governmental safety standards."[72]

### 2.   The Federal Rules of Evidence govern our analysis.

The parties agree we must determine the relevance of industry standards evidence. But they do not offer a clear legal framework to do so. We find the Federal Rules of Evidence control our decision today, but the Federal Rules themselves require us to predict whether the Pennsylvania Supreme Court will follow its substantively expansive view of strict products liability law evident by the two tests in *Tincher* and overrule the categorical exclusion of industry standards evidence announced in *Lewis*.

When we exercise diversity jurisdiction, we apply Pennsylvania's substantive law and federal procedural law.[73] Our inquiry today is whether the competitor product survey is relevant. We must apply federal law if our inquiry is answered by an "arguably procedural" federal law.[74] Our Court of Appeals instructs the Federal Rules of Evidence's "relevancy provisions" are "arguably procedural."[75] Our Court of Appeals regularly applies Article IV of the Federal Rules— which govern relevance—to evidentiary questions arising in Pennsylvania products liability

actions, "notwithstanding Pennsylvania law to the contrary."[76] So we apply the Federal Rules today.

But merely applying the Federal Rules does not mean we ignore Pennsylvania law. Federal Rule 401 controls relevance of evidence. Evidence is relevant under Rule 401 if: (1) the evidence "has any tendency to make a fact more or less probable than it would be without the evidence," and (2) "the fact is of consequence in determining the action."[77] The first element of Rule 401 is a purely "procedural question of evidence law."[78] The second element, however, is a "substantive question regarding the materiality of the evidence."[79] A fact is "of consequence" under Rule 401 "only if it is 'the kind of fact to which proof may properly be directed.'"[80] State substantive law often decides whether "proof may properly be directed" to certain facts.[81] "[T]he substantive components of Pennsylvania products liability law are 'critical' in determining" Rule 401's "of consequence" question.[82]

"Where a state law excludes certain evidence in order to effect substantive policy considerations, Rule 401 acts to exclude the evidence since the proposition for which the evidence is submitted is not properly provable and, therefore, irrelevant to the claim."[83] A state law reflects "substantive policy considerations"—and thus applies to Rule 401—if its "primary objective is directed to influencing conduct through legal incentives."[84] But a state law reflects procedural concerns—and thus is inapplicable to Rule 401—if its primary purpose is "achieving fair, accurate, and efficient resolutions of disputes."[85] The question determining our legal framework, then, is whether the Pennsylvania Supreme Court in *Lewis* excluded industry standards evidence with substantive or procedural concerns as its primary objective.

We find the Pennsylvania Supreme Court in *Lewis* excluded industry standards evidence for substantive policy considerations twenty-seven years before the Pennsylvania Supreme Court

11

set today's standard in *Tincher*. The court in *Lewis* then employed a straightforward application of its 1978 decision in *Azzarello*, which is a substantive decision.[86] The court in "*Lewis* based its reasoning entirely upon [*Azzarello*'s] premise that there shall be no negligence in products liability."[87] By simply applying *Azzarello* to the industry standards context, the court in *Lewis* created substantive Pennsylvania doctrine. The court in *Lewis* itself cited substantive policy concerns warranting exclusion of industry standards evidence. For example, the court held "negligence concepts have no place in a case based on strict liability" because "a product defect is not affected by the fact that the manufacturer or other supplier has exercised 'all possible care.'"[88] Our Court of Appeals later characterized *Lewis* as reflecting Pennsylvania's substantive policy encouraging manufacturers to make products "as safe as possible, as soon as possible," by putting the product, not the manufacturer's design choices, on trial.[89] Without analyzing the substantive versus procedural issue, our Court of Appeals repeatedly applied *Lewis* to federal evidentiary decisions.[90]

To be sure, the Pennsylvania Supreme Court in *Lewis* also cited procedural reasons for excluding industry standards evidence. For example, the court in *Lewis* feared admitting industry standards evidence would "divert[] the jury's attention," "distract the jury," and "confuse the issue."[91] These are the same reasons for which a federal court would exclude evidence under Rule 403.[92] Rule 403 concerns are procedural.[93] But we cannot find the procedural concerns cited by the court in *Lewis* constitute the primary objective of *Lewis*. The court in *Lewis* extended the substantive *Azzarello* doctrine to the industry standards context to "influenc[e] conduct through legal incentives"—namely, the conduct of manufacturers to design products as safely as possible, irrespective of what the industry demanded.[94] The *Lewis* reasoning reflects substantive concerns.

### 3.   We predict the Pennsylvania Supreme Court will not categorically exclude industry standards evidence.

Because Pennsylvania's categorical exclusion of industry standards evidence in products liability trials reflects substantive policy, we must examine whether the Pennsylvania Supreme Court following *Tincher* will determine whether industry standards evidence is "of consequence." We predict the Pennsylvania Supreme Court will overrule *Lewis*'s categorical exclusion of industry standards evidence because it relies on the now-rejected *Azzarello* mandate.

When we sit in diversity jurisdiction, we "may not impose [our] view of what the state law should be."[95] Rather, we "must apply existing state law as interpreted by the state's highest court in an effort to determine how the state court would decide the precise legal issue before the federal court."[96] If the Pennsylvania Supreme Court has not decided the precise issue before us, we must "predict" how it would rule.[97] We should consider "[t]he policies underlying the applicable legal doctrines, the doctrinal trends indicated by these policies, and the decisions of other courts."[98]

The court's *Lewis* holding thirty-five years ago arguably controls the issue before us. But we need not follow *Lewis* for three reasons. First, *Lewis* does not answer the precise legal issue before us: Is industry standards evidence admissible in a post-*Tincher* regime? The Pennsylvania Supreme Court did not decide the admissibility of industry standards evidence after *Tincher*. "To rely upon *Lewis* (handed down in 1987, during the zenith of Pennsylvania's no-negligence-in-strict-liability regime) would be to assume the question out of existence."[99] Second, the Pennsylvania Supreme Court in *Tincher* cast severe doubt upon *Lewis*'s viability by overruling *Azzarello*. As we explained, the court in *Lewis* simply extended *Azzarello* to a specific evidentiary context nine years later. The extinction of *Azzarello* vitiates the *Lewis* reasoning; as our Court of Appeals explains, "Where stops the reason, there stops the rule."[100] Third, even before the Pennsylvania Supreme Court in *Tincher* overruled *Lewis*, our Court of Appeals refused to follow

13

*Lewis*. In *Covell v. Bell Sports, Inc.*,[101] our Court of Appeals rejected *Lewis* because the court in *Lewis* "based its reasoning entirely upon the premise that there shall be no negligence in products liability."[102] Our Court of Appeals rejected *Lewis* while assuming Pennsylvania would adopt the Third Restatement of Torts—necessarily predicting Pennsylvania would overrule *Azzarello*. Our Court of Appeals's prediction regarding adopting the Third Restatement turned out to be wrong, but its prediction about *Azzarello* proved correct. Following our Court of Appeals's guidance applied to a non-*Azzarello* regime shows we need not follow *Lewis*.

We predict the Pennsylvania Supreme Court would overrule its categorical exclusion of industry standards evidence announced in *Lewis* because *Tincher* strongly suggests it must do so to be internally consistent. The Supreme Court's risk-utility test adopted in *Tincher* embraces negligence principles. The court in *Tincher* acknowledged the strict liability theory "overlaps" with the negligence theory and the risk-utility test is "negligence-derived."[103] "The risk-utility test offers courts an opportunity to analyze *post hoc* whether a manufacturer's conduct in manufacturing or designing a product was ***reasonable***."[104] The test "***obviously*** reflects the negligence roots of strict liability."[105] The risk-utility test's seven factors help the jury decide the defectiveness of the product by, for example, examining the availability of a safer, as-useful product. The court found "negligence and strict liability for abnormally dangerous activities also overlap in the sense that they both are premised upon a risk-utility hindsight analysis with different public policy overlays to modify their application to distinct conduct"; the "modif[ied]" application is removing the standard of care element from the strict liability action.[106] We read these many substantive directions from the court's *Tincher* analysis suggests negligence principles may be admissible in both strict liability actions.

14

We are further persuaded the Pennsylvania Supreme Court would remove its categorical bar on industry standards because the Pennsylvania Supreme Court in *Tincher* cited the Illinois Supreme Court adopting its risk-utility test.[107] In Illinois, industry standards evidence is explicitly relevant to the risk-utility test.[108] The very case cited by the Pennsylvania Supreme Court before providing the risk-utility factors, *Calles v. Scripto-Tokai Corp.*,[109] affirms the applicability of "conform[ance] with the design standards of the industry" to the risk-utility test in strict liability.[110] Several other jurisdictions admit industry standards evidence in strict liability claims.[111]

We cannot square a per se exclusion of industry standards evidence with *Tincher*'s criticisms of the *Azzarello* doctrine. The court in *Azzarello* barred negligence principles not by applying relevance principles, but because the court feared the term "unreasonably dangerous" would "mislead[]" jurors.[112] But *Azzarello* involved a complex trial likely to confuse the jury.[113] This complexity made juror confusion a concern in *Azzarello*, but perhaps not in less complex cases. The Supreme Court in *Tincher* criticized *Azzarello* for crafting a broad legal standard from a "distinct, fact-bound context."[114] The court in *Tincher* reminded us of "the necessity of reading legal rules—especially broad rules—against their facts and the corollary that judicial pronouncements should employ due modesty."[115] The court in *Tincher* bemoaned *Azzarello*'s "problem of extrapolating broad lessons from very particular circumstances."[116] The *Lewis* analysis extending from *Azzarello* suffers the same flaws the court in *Tincher* identified in *Azzarello*. The court in *Lewis* thirty-five years ago applied *Azzarello*'s "broad pronouncement" barring negligence principles to the industry standards context. Industry standards, according to *Lewis*, is a negligence principle; *ipso facto*, it is always inadmissible. But the court in *Azzarello* "did not require such a broad pronouncement" of per se exclusion of negligence concepts.[117] Nor

did *Lewis*. Continuing to bar industry standards evidence irrespective of facts and context violates the Pennsylvania Supreme Court's teachings of "judicial modesty" in *Tincher*.[118]

We are also mindful the court in *Tincher* telegraphed its disapproval of *Lewis*. The court acknowledged its opinion in *Tincher* might affect "subsidiary issues constructed from *Azzarello*."[119] At the end of the section of *Tincher* overruling *Azzarello*, the Supreme Court noted: "Subsequent application of *Azzarello* elevated the notion that negligence concepts create confusion in strict liability cases to a doctrinal imperative, whose merits were not examined to determine whether such a bright-line rule was consistent with reason in light of the considerations pertaining to the case."[120] *Lewis* is a "subsequent application" of *Azzarello* regarding negligence concepts. *Lewis*'s "bright-line rule" may be inconsistent with the facts of a given case (as here). *Tincher*'s language suggests *Lewis*'s bright-line rule of excluding industry standards evidence is extinct.

Always excluding industry standards evidence would also violate *Tincher*'s functional purpose of reducing jury confusion. *Azzarello* mandated an "impracticable" standard which forced juries to decide the "unreasonably dangerous" nature of a product despite hearing no evidence about reasonableness.[121] *Azzarello* "perpetuated jury confusion . . . rather than dissipating it."[122] Continuing to exclude negligence-based evidence regarding industry standards furthers the same goal *Tincher* rejected. Juries are competent to hear relevant evidence and decide its application to the risk-utility test. We need not shield juries from industry standards as a "bright-line rule." Consistent with *Tincher*, we should evaluate the admissibility of industry standards evidence on a case-by-case basis.

We recognize we are not following the Superior Court's most recent view expressed in *Sullivan* now before the Pennsylvania Supreme Court on a discretionary appeal.[123] The Superior

Court in *Sullivan* assumed the only purpose for which a party would offer industry standards evidence is to establish a due care defense.[124] We agree with *Sullivan* a due care defense does not exist in strict liability, so compliance with industry standards is not ***dispositive***.[125] But the evidence's non-dispositive nature does not render it inadmissible. Compliance with an industry standard may prove whether the manufacturer's assessment of the risks and utilities of designing the product as it did were reasonable. And non-compliance with an industry standard may prove the manufacturer created an unreasonable risk in designing the product as it did. Industry standards evidence thus reflects an item of proof relevant to the risk-utility test.

The Superior Court in *Sullivan* appeared to de-contextualize the analysis of Professors Wertheimer and Rahdert to support excluding industry standards evidence. Professors Wertheimer and Rahdert analyzed a ***jury instruction*** about an industry standards-based ***defense***.[126] They rejected a due care defense based on complying with industry standards because it creates a non-existent element of a tort—namely, compliance with a standard of care. We agree with the professors a due care defense is not available in strict liability, and we will not read a jury instruction about due care. But the unavailability of a due care jury instruction does not render industry standards evidence irrelevant. The Superior Court in *Sullivan* extended the Professors' analysis from a jury instruction to admissibility of evidence. The evidence may be relevant for other purposes, like proving or disproving the risk-utility test.

We predict the Pennsylvania Supreme Court would lift its categorical exclusion of industry standards evidence in strict liability actions.

### 4. Louisville Ladder's competitor products survey is relevant to the risk-utility test.

We now turn to the procedural question of Rule 401: Does Louisville Ladder's competitor products survey tend to make a fact of consequence more or less probable? We find it does.

To prove his strict liability claim, Mr. Lehmann must prove the scaffold fails the consumer expectations test or the risk-utility test. Louisville Ladder does not argue the competitor product survey is relevant to the consumer expectations test, so we analyze the risk-utility test.

As we describe above, the risk-utility test "articulates the" balancing of seller's interests versus consumer's interests "more from the perspective of the reasonable seller."[127] The risk-utility test "offers courts an opportunity to analyze *post hoc* whether a manufacturer's conduct in manufacturing or designing a product was reasonable."[128] If "a reasonable person would conclude that the probability and seriousness of harm caused by the product outweigh the burden or costs of taking precautions," the product is defective.[129]

We find the competitor products survey relevant to the risk-utility test. The competitor product survey is directly relevant to the third and fourth factors of the test. The competitor product survey is relevant to the third factor because it directly answers whether "a substitute product" meeting the same need and not as expensive existed. If Louisville Ladder's peers designed scaffolds similar in price and design to the ST0606A scaffold and meeting the same need, it becomes "more probable" the ST0606A scaffold is reasonably designed and therefore not defective. A jury could consider evidence regarding the unavailability of substitute products in the market to conclude a reasonable person would find the burden or costs of taking precautions outweighed the probability and seriousness of harm by not taking precautions. The competitor product survey is also relevant to the fourth factor. If none of Louisville Ladder's peers eliminated the unsafe nature of the product without eliminating the product's utility or making it too expensive to maintain its utility, it becomes "more probable" the ST0606A scaffold is reasonably designed and therefore not defective. A jury could consider evidence regarding the manufacturer's inability to eliminate the unsafe character of the product to conclude a reasonable person would find the

burden or costs of taking precautions outweighed the probability and seriousness of harm by not taking precautions.

We agree with Judge Pappert's analysis finding evidence of industry standards relevant to the risk-utility test in *Cloud v. Electrolux Home Products, Inc.*[130] The manufacturer proffered evidence its product complied with an industry standard promulgated by the American National Standards Institute.[131] Judge Pappert found—as we find today—industry standards "evidence of course is not dispositive, but it is relevant and probative given the *post hoc* evaluation of a manufacturer's conduct that *Tincher* invites, even in strict liability cases."[132]

Mr. Lehmann need not "open the door" to industry standards evidence for Louisville Ladder's industry standards evidence to be admissible. Some judges find defendants may introduce evidence of compliance with industry standards only once a plaintiff introduces evidence of non-compliance.[133] But we cannot identify a reason Louisville Ladder must wait for Mr. Lehmann to adduce evidence of non-compliance. Both compliance and non-compliance with industry standards are facts "of consequence" in a strict liability case. The jury may consider any facts relevant to the risk-utility test. A plaintiff may, for example, argue a product bore high probability of causing injury under the second factor of the risk-utility test. The defendant may rebut such evidence with evidence regarding the utility of designing the product that way. The jury may consider this evidence as part of its risk-utility analysis.

**B. We exclude evidence of Mr. Lehmann's conduct except as relevant to Mr. Lehmann's failure-to-warn theory.**

Mr. Lehmann moves to exclude evidence of his conduct while using the model ST0606A scaffold.[134] He specifically moves to exclude Louisville Ladder's expert, Michael Van Bree, from adducing evidence Mr. Lehmann failed to engage the scaffold's "manual pins," he possessed experience using the ST0606A scaffold, he did not read the "on-product instructions," did not

"inspect the product properly," and "failed to follow the product warnings and instructions."[135] Mr. Van Bree submitted an expert report in which he opines Mr. Lehmann should have inserted "manual pins" on the sides of the scaffold to ensure the latch pins would not become unscrewed.[136] Louisville Ladder responds we cannot decide the motion without a developed record. Louisville Ladder alternatively argues its proffered evidence is relevant to causation.

We admit the evidence as relevant to Mr. Lehmann's failure-to-warn theory. We recognize the evidence is irrelevant to Mr. Lehmann's design defect theory and will issue a limiting instruction as appropriate.

Mr. Lehmann asserts a failure-to-warn theory of strict liability. A failure-to-warn theory requires Mr. Lehmann to establish "both that the product was sold in an 'unreasonably dangerous' condition and that the failure to warn about the danger caused [his] injury."[137] Causation requires Mr. Lehmann to prove "first that the hazardous condition of the product was a cause in fact of his injury, and then that the absence or inadequacy of warnings addressing that condition was the legal cause of his injury."[138] "Establishing causation requires a plaintiff to demonstrate a different or additional warning by the seller would have caused the plaintiff to avoid the risk."[139] Pennsylvania law "presumes that warnings will be obeyed."[140] "To rebut that presumption, the defendant 'must produce evidence that such a warning would not have been heeded.'"[141] Liability for failure-to-warn attaches "only when there is sufficient evidence that additional warnings or reminders may have made a difference."[142]

Evidence of Mr. Lehmann's experience with the scaffold, ignorance of warnings and instructions, non-inspection of the scaffold, and non-engagement of the manual pins is relevant to disprove Mr. Lehmann's failure-to-warn theory. Mr. Lehmann's failure-to-warn theory is Louisville Ladder failed to warn the scaffold's users about the product's dangers, "including the

fact that the platform latch pins can rotate out of position during foreseeable use."[143] Had the scaffold warned users to check its pins before each use, Mr. Lehmann argues, the accident would not have occurred because different warnings would have made him "check the scaffold each and every time he climbed upon it."[144] Louisville Ladder may rebut this evidence by showing Mr. Lehmann would not have heeded different warnings because he ignored the warnings and instructions on the scaffold. This evidence makes it more probable Mr. Lehmann would not have heeded different warnings and thus would not have checked the scaffold every time he climbed onto it. Judges in our Circuit admit evidence under Pennsylvania law making it more probable than not the plaintiff would have ignored different warnings.[145] This result would prejudice Louisville Ladder by shielding the jury from information about Mr. Lehmann's failures to check the warnings. And the jury may hear evidence Mr. Lehmann did not engage the manual pins to understand what conduct the warnings might have changed.[146]

Mr. Lehmann argues the evidence is not relevant under *Sullivan*. After considering industry standards evidence, the Pennsylvania Superior Court in *Sullivan* affirmed the trial court's jury instruction the jury could not consider the plaintiff's failure to rotate deck pins before each use of the scaffold.[147] We give this portion of the *Sullivan* opinion "significant weight" because we identify no "indication" the Supreme Court would rule otherwise.[148] But the court in *Sullivan* considered the evidence as relevant to a design defect theory, not a failure-to-warn theory. The trial court admitted evidence of the plaintiff's conduct and apparently permitted the jury to consider it for the plaintiff's failure-to-warn theory.[149] We do the same because the evidence is relevant to whether different warnings would have prevented Mr. Lehmann's harm.

We recognize the evidence is irrelevant to the design defect claim under *Sullivan*. We recognize parsing is necessary in our jury instruction to ensure the jury understands the evidence

may be considered only for the purposes of Mr. Lehmann's failure-to-warn theory but not his design defect theory. We will consider the parties' proposed limiting instructions regarding how the jury may consider this evidence for the failure-to-warn theory should it remain in the case. Second, Louisville Ladder cannot adduce evidence Mr. Lehmann failed to engage the manual pins and inspect the scaffold before using it unless Mr. Lehmann opens the door by adducing the evidence on his own. Mr. Lehmann's failure to engage the manual pins and inspect the scaffold are the alleged results of Louisville Ladder's failure to warn. Mr. Lehmann must adduce evidence showing "the absence or inadequacy of warnings" about the product's defect caused his injury.[150] We only admit this evidence for Louisville Ladder to rebut the failure-to-warn theory. If Mr. Lehmann does not adduce such evidence, Louisville Ladder cannot adduce it on its own to rebut a non-existent theory.

### C. We admit evidence Louisville Ladder's competitors sold differently designed scaffolds.

Mr. Lehmann proffers evidence of baker scaffolds with different designs sold by Louisville Ladder's competitors. Louisville Ladder moves to exclude the evidence as irrelevant.[151] Mr. Lehmann responds the evidence is relevant to the consumer expectations test and risk-utility test because it helps define the consumer's reasonable expectations and shows the availability of a substitute product. We find the evidence relevant to both tests.[152]

First, the proffered evidence is relevant to the consumer expectations test. The consumer expectations test asks whether a product contains a "surprise element of danger" from the standpoint of the reasonable consumer.[153] In examining the test, we should consider "[t]he nature of the product, the identity of the user, the product's intended use and intended user, and any express or implied representations by a manufacturer or other seller are among considerations relevant to assessing the reasonable consumer's expectations."[154] If alternative designs existed

which eliminated the "surprise" danger inherent in the scaffold, it helps prove whether the reasonable consumer would find the model ST0606A scaffold defective. The Pennsylvania Supreme Court in *Tincher* acknowledged "the existence and specifications of an alternative design is relevant and even highly probative to prove disputed issues in a products liability case."[155] The plaintiff is not **required** to adduce such evidence, but such evidence is often "the most persuasive and efficient means of convincing the trier of fact" of a product's defectiveness.[156] We admit the evidence as relevant to the consumer expectations test.

Second, the evidence is relevant to the risk-utility test. The evidence is relevant to the risk-utility test for the same reasons Louisville Ladder's competitor products survey is admissible. Evidence showing Louisville Ladder's competitors made similar, safer products is relevant to at least the third factor and fourth factors. The existence of substitute products with alternative designs which competitors sold is relevant to the reasonableness of the product's risk-utility balancing.

### D. We exclude references to the "hierarchy of safety" ethical guidance under Rule 403.

Louisville Ladder moves to preclude Mr. Lehmann's expert, Russ Ransic, from testifying its scaffold did not comply with the "hierarchy of safety" under Rule 403.[157] According to Mr. Ransic, the hierarchy of safety includes five "design priorities" which the American Society of Mechanical Engineers recommends engineers "hold paramount" in designing objects.[158] Louisville Ladder argues this evidence will mislead the jury because whether Louisville Ladder complied with ethical standards is not at issue. Mr. Lehmann responds the evidence is admissible because it helps the jury understand how engineers should "identify and confront" hazards.[159] We exclude references to the hierarchy of safety under Rule 403.[160]

Under Rule 403, we may exclude relevant evidence if its probative value is substantially outweighed by a danger of "unfair prejudice, confusing the issues, misleading the jury, undue

delay, wasting time, or needlessly presenting cumulative evidence."[161] We enjoy "broad discretion in making a Rule 403 determination."[162]

Mr. Ransic opines the hierarchy of safety is a code of ethics promulgated by the American Society of Mechanical Engineers for designing products. It includes five "design priorities": (1) eliminating the hazard from the product, (2) keeping the hazard in the product but neutralizing it, (3) providing warnings about the hazard, (4) modifying user behavior to avoid the hazard, and (5) giving users protective equipment and clothing.[163]

We find the probative value of the hierarchy of safety substantially outweighed by unfair prejudice and confusing the issues. The probative value of the hierarchy of safety is scant. While it is somewhat relevant to the risk-utility test because it prescribes a process for eliminating risks in design, it is not clearly applicable to any of the seven risk-utility factors. Whatever relevance the hierarchy of safety possesses is substantially outweighed by danger of unfair prejudice. The hierarchy of safety assumes the presence of a hazard. Step one of the hierarchy directs engineers to eliminate the hazard. But the hierarchy does not explain what engineers should do to ensure the product is designed without a hazard in the first place. By assuming the presence of a hazard, an expert witness's references to the hierarchy will unfairly prejudice Louisville Ladder.

The hierarchy of safety also poses a danger of confusing the issues. Mr. Lehmann does not establish Louisville Ladder agreed to follow the hierarchy or had an industry requirement to follow it. It is a code of ethics which may not apply especially when no party shows how it may apply. References to the hierarchy of safety suggests Louisville Ladder needed to follow a standard of care established by engineering professional, which is not an element of strict liability. The jury is not deciding Louisville Ladder's ethics; it is deciding whether Mr. Lehmann shows a design defect in the scaffold. Mr. Ransic may offer his opinions as to the ST0606A scaffold's defectiveness

without referencing this ethical standard; indeed, Mr. Lehmann admits the hierarchy of safety does not determine the product's defectiveness.[164] We exclude references to the hierarchy of safety.[165]

### E. We exclude Mr. Lehmann's proffered evidence of earlier accidents involving the ST0606A scaffold.

Louisville Ladder moves to preclude Mr. Lehmann from adducing evidence of similar, earlier accidents involving the same make of scaffold at issue here.[166] Louisville Ladder argues the earlier accidents do not bear substantial similarity to the accident involving Mr. Lehmann, so the jury should not hear it. Mr. Lehmann argues the previous accidents are similar to his, so the evidence is admissible. We exclude evidence of earlier accidents involving the ST0606A scaffold.

We may admit "evidence of other accidents as direct proof of a design defect," but "only if the proponent demonstrates that the accidents occurred under circumstances substantially similar to those at issue in the case at bar."[167] The proponent must establish a foundation of substantial similarity between the previous accident and the accident at issue.[168] If the proponent cannot show substantial similarity, the previous accident is irrelevant.[169] We "retain wide discretion to determine the admissibility" of previous accidents, "including on the question of substantial similarity."[170]

Mr. Lehmann proffers evidence of three earlier accidents: (1) an accident involving a different scaffold produced by a different company at issue in *Sullivan*;[171] (2) an accident involving the ST0606A scaffold described in a 2020 Missouri lawsuit (the "*Kauten*" suit);[172] and (3) an accident involving the ST0606A scaffold described in a 2016 California lawsuit (the "*Charez*" suit).[173] Mr. Lehmann also proffers the testimony of Edward Christy, the workman responsible for safety at Mr. Lehmann's job site, who will testify he "heard of" other accidents involving the ST0606A scaffold. We exclude all four categories of evidence.

First, we exclude evidence of the *Sullivan* accident as irrelevant because a different company manufactured the scaffold. While previous accidents and the accident at issue need not be exactly alike, they should at least involve the "same instrumentality."[174] Otherwise, Mr. Lehmann could attempt to prove the defectiveness of Louisville Ladder's scaffold by proving the defectiveness of another company's similar scaffold. This evidence does not bear sufficient indicia of similarity, making it irrelevant. Assuming *arguendo* the evidence is relevant, we would still exclude it under Rule 403 because its unfair prejudice to Louisville Ladder would substantially outweigh its probative value. The evidence would unfairly prejudice Louisville Ladder by allowing a jury to infer Louisville Ladder's scaffold was defective because an accident occurred on some other company's similar scaffold. The other accident bears little probative value of proving Louisville Ladder's scaffold was defective because the evidence is about a different scaffold.

Second, we exclude evidence of the accident from the *Kauten* lawsuit because Mr. Lehmann does not meet his burden to show substantial similarity between the accident and his own. Mr. Lehmann simply attaches the complaint from the *Kauten* case. The *Kauten* complaint involved the ST0606A scaffold, but the complaint shows the scaffold collapsed when **two** workmen stood on the platform.[175] This is different from our case, where only Mr. Lehmann stood on the platform. This difference suffices to render *Kauten* not substantially similar to this case and therefore irrelevant. Assuming *arguendo* the relevance of the *Kauten* accident, it is inadmissible for at least three other reasons. First, Mr. Lehmann provides no proof the allegations of *Kauten* occurred. He simply proffers the complaint constituting allegations of the accident's occurrence.

Second, even assuming the truth of the allegations in *Kauten*, admitting evidence of the *Kauten* accident risks a mini-trial as to whether the accident in *Kauten* proves defectiveness because two people stood on the platform in *Kauten*. The parties could be forced to compare the

weights of Mr. Lehmann with the people on the scaffold in *Kauten* and argue about whether the *Kauten* collapse proves defectiveness when only two people stand on the scaffold. Third, Mr. Lehmann does not explain how he will adduce evidence of the *Kauten* case at trial other than by introducing the complaint in *Kauten*. The *Kauten* complaint is an out-of-court statement offered to prove the defectiveness of the Louisville Ladder scaffold, making it inadmissible hearsay. We preclude evidence of the *Kauten* accident.

Third, the same reasoning applies to exclude the allegations in *Charez* with more force. While Mr. Lehmann at least proffers a complaint from the *Kauten* case, he merely proffers a form complaint from *Charez* which vaguely alleges a "steel rolling scaffold" apparently manufactured by Louisville Ladder caused the plaintiff's harm.[176] The *Charez* document provides no details regarding how the plaintiff's injury occurred. The plaintiff ultimately dismissed the lawsuit.[177] Mr. Lehmann does not come close to establishing a foundation of substantial similarity between his accident and the *Charez* accident. Even if he did, the same reasons for inadmissibility infecting the *Kauten* complaint—lack of proof the allegations occurred, unfair prejudice to Louisville Ladder, and hearsay—exist in the *Charez* complaint. We preclude evidence of the *Charez* accident.

Fourth, we preclude Mr. Christy from testifying he "heard of" other accidents involving the ST0606A scaffold because it constitutes hearsay and Mr. Christy lacks personal knowledge of these other accidents. Mr. Christy only knows about other accidents because he "heard of" them. Mr. Christy "heard of" these accidents from out-of-court statements offered for the truth these accidents indeed occurred. This is hearsay. Mr. Christy also lacks personal knowledge of the other accidents.[178] Mr. Christy's proffered testimony demonstrates he lacks personal knowledge about these other accidents. When asked if he knew of other accidents involving the scaffold, Mr. Christy responded: "I've heard of it, but I've never experienced it until" the job where Mr. Lehmann got

injured.[179] His personal knowledge of these other accidents is based on hearsay. Personal knowledge based on hearsay is inadmissible as it would eviscerate the rule against hearsay.[180] We preclude Mr. Christy from referencing other accidents of which he has no personal knowledge.

### F.  We exclude Louisville Ladder's proffered evidence of no earlier accidents involving the ST0606A scaffold.

Louisville Ladder proffers Mr. Van Bree to testify about the lack of earlier accidents. Mr. Lehmann moves to exclude evidence of an absence of accidents involving the same scaffold.[181] He argues Louisville Ladder fails to lay an appropriate foundation under our Court of Appeals's test for evidence regarding the absence of earlier accidents. Louisville Ladder argues it laid a proper foundation for the evidence of absence of earlier accidents. We agree with Mr. Lehmann and exclude the evidence.

In *Forrest v. Beloit Corp.*, our Court of Appeals noted testimony about absence of earlier accidents "raises significant concerns regarding unfair prejudice to the plaintiff."[182] Our Court of Appeals cited four problems: (1) a witness's lack of knowledge of previous accidents "does not prove that no such accidents occurred"; (2) a plaintiff may rebut evidence about absence of accidents only with specific instances of accidents, which may be impossible evidence to obtain; (3) the absence of previous accidents might establish only "that the plaintiff was the first to be injured"; and (4) an absence of previous accidents does not tell us how many "near-accidents" occurred.[183] To combat these prejudices, a plaintiff must establish a specific foundation involving three elements: "(a) *similarity*—the defendant must show that the proffered testimony relates to substantially identical products used in similar circumstances; (b) *breadth*—the defendant must provide the court with information concerning the number of prior units sold and the extent of prior use; and (c) *awareness*—the defendant must show that it would likely have known of prior accidents had they occurred."[184]

28

Louisville Ladder does not proffer a sufficient foundation for Mr. Van Bree's testimony; indeed, Louisville Ladder does not try. Louisville Ladder simply argues the absence of previous accidents is relevant and we should examine the foundation for the evidence at trial.[185] Louisville Ladder ignores our Policies and Procedures, which specify we "strongly discourage[]" evidentiary disputes at trial and "counsel should expect rulings on outstanding motions at, or shortly after, the final pretrial conference."[186] We provided Louisville Ladder weeks to respond to Mr. Lehmann's motion, during which time Louisville Ladder could have explained the foundation for the evidence under our Court of Appeals's controlling precedent. It did not.

Louisville Ladder would not have met its burden anyway given the adduced evidence. Mr. Van Bree swore Louisville Ladder maintains no specific policy or procedure for gathering customer complaints.[187] Mr. Van Bree also does not identify the breadth of scaffolds Louisville Ladder sold, making it impossible to identify the likelihood of near-miss accidents. A more compelling reason to preclude Mr. Van Bree from testifying about the absence of previous accidents is because we know of the complaints in *Kauten* and *Charez*. We exclude evidence of those complaints because Mr. Lehmann does not lay a proper foundation, so Mr. Lehmann has no method of effectively cross-examining Mr. Van Bree's knowledge of the complaints. We do not make credibility findings as to Mr. Van Bree, but Mr. Lehmann's inability to cross-examine him provides another reason to exclude his testimony. The deficiencies in Mr. Van Bree's testimony animate the very concerns our Court of Appeals noted in *Forrest*.[188]

### III.    Conclusion

We admit evidence of Louisville Ladder's competitor products survey, Mr. Lehmann's conduct shortly before the fall (what Louisville Ladder may characterize as his negligence) for the limited purpose of his failure-to-warn theory of strict liability but not for his design defect theories, and evidence Louisville Ladder's competitors sold differently designed scaffolds. We exclude

evidence of the scaffold's non-compliance with the "hierarchy of safety," evidence of previous accidents involving the same or similar scaffolds, and evidence of the absence of earlier accidents involving the same scaffold.

---

[1] ECF Doc. No. 1-6 ¶ 3.

[2] *Id.* ¶ 4.

[3] *Id.* ¶¶ 4–6.

[4] *Id.* ¶ 6.

[5] *Id.* ¶ 4.

[6] *Id.* ¶ 6.

[7] *Id.* ¶ 9.

[8] *Id.* ¶¶ 9, 12.

[9] *Id.* ¶¶ 15–16.

[10] *Id.* ¶ 15. Mr. Lehmann originally alleged negligence but dropped the claim. ECF Doc. Nos. 74, 75.

[11] ECF Doc. No. 28 at 2.

[12] *Id.* at 6.

[13] *Id.* at 7.

[14] ECF Doc. Nos. 59–61.

[15] ECF Doc. Nos. 35, 37, 39.

[16] *Sullivan v. Werner Co.*, 253 A.3d 730, 746 (Pa. Super. Ct. 2021), *appeal granted*, No. 324 EAL 2021, 2022 WL 2062309 (Pa. June 8, 2022).

[17] *Chandler v. L'Oreal USA, Inc.*, 340 F. Supp. 3d 551, 561 (W.D. Pa. 2018) (internal quotations omitted), *aff'd*, 774 F. App'x 752 (3d Cir. 2019).

[18] *Tincher v. Omega Flex, Inc.*, 104 A.3d 328, 387–89 (Pa. 2014).

[19] *Id.* at 335, 387.

[20] *Id.* at 335.

[21] ECF Doc. No. 59 at 8.

[22] ECF Doc. No. 59.

[23] *See, e.g.*, *Sullivan*, 253 A.3d at 737 (expert witness's observation a certain design "was the most prevalent in the industry" is industry standards evidence).

[24] 104 A.3d 328.

[25] 253 A.3d 730.

[26] The appellant's opening brief is due on July 18, 2022 in the *Sullivan* appeal. *See* Docket at 4, *Sullivan*, 2022 WL 2062309.

[27] *Mercurio v. Louisville Ladder, Inc.*, No. 16-412, 2019 WL 1657325, at *7 (M.D. Pa. Apr. 17, 2019).

[28] *Sullivan*, 253 A.3d at 741.

[29] 391 A.2d 1020 (Pa. 1978), *overruled by Tincher*, 104 A.3d 328.

[30] *High v. Pennsy Supply, Inc.*, 154 A.3d 341, 347 (Pa. Super. Ct. 2017).

[31] *Azzarello*, 391 A.2d at 1027.

[32] *Id.*

[33] *Tincher*, 104 A.3d at 379–80 (emphasis added) (explaining *Azzarello*).

[34] *Sullivan*, 253 A.3d at 740 n.5 (describing *Azzarello*).

[35] 528 A.2d 590 (Pa. 1987).

[36] *Id.* at 594.

[37] *Id.*

[38] *Id.* at 593.

[39] *Id.* at 594. The Pennsylvania Supreme Court in *Lewis* agreed with our Court of Appeals's interpretation of Pennsylvania law in *Holloway v. J.B. Systems, Ltd.*, holding "negligence concepts such as 'trade custom' or 'reasonable care' have no place in suits brought under [section] 402A as

that section has been interpreted by the Pennsylvania courts." 609 F.2d 1069, 1073 (3d Cir. 1979). Our Court of Appeals "read *Azzarello* as a signal that evidence and jury instructions regarding negligence concepts should be kept out of cases brought under [section] 402A." *Id.* The Pennsylvania Superior Court affirmed the *Lewis* rationale in a pre-*Tincher* opinion in 2009. *See Gaudio v. Ford Motor Co.*, 976 A.2d 524, 543 (Pa. Super. Ct. 2009).

[40] 104 A.3d 328.

[41] *Id.* at 376.

[42] *Id.* at 377.

[43] *Id.*

[44] *Id.* at 379.

[45] *Id.* at 387–89.

[46] *Id.* at 387.

[47] *Id.*

[48] *Id.*

[49] *Id.*

[50] *Id.* at 389.

[51] *Id.*

[52] *Id.* at 389–90.

[53] *Id.* at 409.

[54] *Id.* at 367.

[55] *See, e.g.*, *Webb v. Volvo Cars of N. Am., LLC*, 148 A.3d 473, 483 (Pa. Super. Ct. 2016) ("*Tincher* will affect every stage of future products liability cases.").

[56] *Id.* at 482–83. Other Superior Court decisions touched on the issue without affirmatively deciding it. *See Renninger v. A & R Mach. Shop*, 163 A.3d 988, 999 (Pa. Super. Ct. 2017) (assuming trial court erred by admitting government standards evidence because error was harmless); *Dunlap v. Fed. Signal Corp.*, 194 A.3d 1067, 1072 n.8 (Pa. Super. Ct. 2018) (describing *Renninger*).

[57] *Cloud v. Electrolux Home Prod., Inc.*, No. 15-571, 2017 WL 3835602, at *2 (E.D. Pa. Jan. 26, 2017). Like the Superior Court, other District Court decisions mentioned the issue without deciding it. *See Vitale v. Electrolux Home Prod., Inc.*, No. 15-1815, 2018 WL 3868671, at *3 (E.D. Pa. Aug. 14, 2018) (admitting industry standards evidence because plaintiff asserted a negligence claim); *Rapchak v. Haldex Brake Prod. Corp.*, No. 13-1307, 2016 WL 3752908, at *3 (W.D. Pa. July 14, 2016) (finding decision as to industry standards "premature" due to insufficient proffers).

[58] *Mercurio*, 2019 WL 1657325, at *7–8.

[59] 253 A.3d 730.

[60] *Id.* at 746.

[61] *Id.* at 736–37.

[62] *Id.* at 746.

[63] *Id.* at 747.

[64] *Id.* at 746.

[65] *Id.*

[66] *Id.*

[67] *Id.* at 747 (quoting Ellen Wertheimer & Mark C. Rahdert, *The Force Awakens:* Tincher, *Section 402a, and the Third Restatement in Pennsylvania*, 27 Widener Commonwealth L. Rev. 157, 210 (2018)).

[68] *Id.* (quoting *The Force Awakens*, 27 Widener Commonwealth L. Rev. at 210).

[69] *Id.*

[70] *See, e.g.*, *Palmer v. Black & Decker (U.S.) Inc.*, No. 20-1084, 2022 WL 1813848, at *9; *Malcolm v. Regal Ideas, Inc.*, No. 19-239, 2021 WL 3006653, at *7 (E.D. Pa. July 15, 2021).

[71] *Sullivan*, 2022 WL 2062309, at *1.

[72] *Id.*

[73] *See Salas by Salas v. Wang*, 846 F.2d 897, 905 (3d Cir. 1988).

[74] *Covell v. Bell Sports, Inc.*, 651 F.3d 357, 366 (3d Cir. 2011), *abrogation on other grounds recognized by DeJesus v. Knight Indus. & Assocs., Inc.*, 599 F. App'x 454, 455 (3d Cir. 2015).

[75] *Id.*

[76] *Id.* (quoting *Kelly v. Crown Equip. Co.*, 970 F.2d 1273, 1278 (3d Cir. 1992)); *see also Moyer v. United Dominion Indus., Inc.*, 473 F.3d 532, 542 (3d Cir. 2007); *Forrest v. Beloit Corp.*, 424 F.3d 344, 358 (3d Cir. 2005); *Kelly*, 970 F.2d at 1278.

[77] Fed. R. Evid. 401.

[78] *Sims v. Great Am. Life Ins. Co.*, 469 F.3d 870, 881 (10th Cir. 2006); 19 Fed. Prac. & Proc. Juris. § 4512 n.51 (Wright & Miller 3d ed.).

[79] *Sims*, 469 F.3d at 881; 19 Fed. Prac. & Proc. Juris. § 4512 n.51.

[80] *Sims*, 469 F.3d at 881 (quoting Fed. R. Evid. 401 advisory committee notes).

[81] *Id.*; *see also Harris v. Midas*, No. 17-95, 2019 WL 5294266, at *3 (W.D. Pa. Oct. 18, 2019) (applying *Sims*); *In re Gen. Motors LLC Ignition Switch Litig.*, No. 14-2543, 2017 WL 2493143, at *2 (S.D.N.Y. June 9, 2017) (same).

[82] *Forrest*, 424 F.3d at 358 n.9 (quoting *Diehl v. Blaw-Knox*, 360 F.3d 426, 431 n.3 (3d Cir. 2004)).

[83] *Sims*, 469 F.3d at 881.

[84] *Id.* at 883.

[85] *Id.*

[86] *Moyer*, 473 F.3d at 541 (*Azzarello* decided "substantive rights of litigants in the products liability context").

[87] *Covell*, 651 F.3d at 366.

[88] *Lewis*, 528 A.2d at 593.

[89] *See Habecker v. Clark Equip. Co.*, 36 F.3d 278, 285 (3d Cir. 1994).

[90] *See, e.g.*, *Santiago v. Johnson Mach. & Press Corp.*, 834 F.2d 84, 85 (3d Cir. 1987) ("[W]e have the opportunity and the obligation to apply [*Lewis*] to the disposition of this appeal.").

[91] *Lewis*, 528 A.2d at 594.

[92] *See* Fed. R. Evid. 403 ("The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, ***confusing the issues***, ***misleading the jury***, undue delay, wasting time, or needlessly presenting cumulative evidence." (emphasis added)).

[93] *See Forrest*, 424 F.3d at 354 ("The admissibility of the evidence ultimately turns on a balancing of its probative value versus its prejudicial effect, and we have held that in a federal court the Federal Rules of Evidence govern procedural issues of this nature.").

[94] *Sims*, 469 F.3d at 883.

[95] *Durkot v. Tesco Equip., LLC*, 654 F. Supp. 2d 295, 298 (E.D. Pa. 2009).

[96] *Id.*

[97] *Mercurio*, 2019 WL 1657325, at *3 (M.D. Pa. Apr. 17, 2019) (citing *Pa. Sand Corp. v. Caterpillar Tractor Co.*, 652 F.2d 1165, 1167 (3d Cir. 1981)).

[98] *Id.* (quoting *Pa. Sand Corp.*, 652 F.2d at 1167).

[99] *Covell*, 651 F.3d at 365–66.

[100] *Id.* at 366 (quoting *Aenta Life & Cas. Co v. Barthelemy*, 33 F.3d 189, 193 (3d Cir. 1994)).

[101] 651 F.3d 357.

[102] *Id.* at 366.

[103] *Tincher*, 104 A.3d at 403.

[104] *Id.* at 389 (emphasis added).

[105] *Id.* (emphasis added).

[106] *Id.* at 402.

[107] *Id.* at 389 (citing *Blue v. Envt'l Eng'g, Inc.*, 828 N.E.2d 1128, 1140–41 (Ill. 2005) and *Calles v. Scripto–Tokai Corp.*, 864 N.E.2d 249, 260–61 (Ill. 2007)).

[108] *See Calles*, 864 N.E.2d at 260 (cited in *Tincher*, 104 A.3d at 389) (whether design "conform[ed] with the design standards of the industry" is relevant to the risk-utility analysis); *see also Cappellano v. Wright Med. Grp., Inc.*, 838 F. Supp. 2d 816, 827 (C.D. Ill. 2012) (industry standards evidence is relevant to strict liability case). While Illinois follows the Third Restatement unlike Pennsylvania, this difference does not vitiate the relevance of its findings regarding industry standards because the jurisdictions use the same tests to prove risk-utility.

[109] 864 N.E.2d 249.

[110] *Id.* at 260.

[111] *See, e.g.*, Am. L. Prod. Liab. 3d § 30:48 n.2 (compiling *Siems v. Bumbo Int'l Tr.*, No. 13-796, 2014 WL 4954068, at *3 (W.D. Mo. Oct. 2, 2014), *Niemeyer v. Ford Motor Co.*, No. 09-2091, 2012 WL 3277273, at *10 (D. Nev. Aug. 9, 2012); *Cullison v. Hilti, Inc.*, No. 09-4122, 2011 WL 5926758, at *1 (D.S.D. Nov. 28, 2011); *Boy v. I.T.T. Grinnell Corp.*, 724 P.2d 612, 621 (Ct. App. 1986)).

[112] *Azzarello*, 391 A.2d at 1027.

[113] *Tincher*, 104 A.3d at 377.

[114] *Id.* at 377.

[115] *Id.* at 378.

[116] *Id.*

[117] *Id.*

[118] *Id.*

[119] *Id.* at 409.

[120] *Id.* at 381.

[121] *Id.* at 380 ("[I]n the context of a strict liability claim, whether a product is defective depends upon whether that product is 'unreasonably dangerous.' Yet, *Azzarello* divorced one inquiry from the other[.]").

[122] *Id.* at 378.

[123] We must afford "significant weight" to the Superior Court's decisions in predicting how the Supreme Court would rule unless we identify "any indication that the highest state court would rule otherwise." *State Farm Mut. Auto. Ins. Co. v. Rosenthal*, 484 F.3d 251, 253 (3d Cir. 2007). As provided above, we think the Supreme Court will rule otherwise when it decides the appeal of *Sullivan*.

[124] *See Sullivan*, 253 A.3d at 747 ("[E]vidence of industry standards may be excluded because those standards do not go to the safety of the product itself but to the manufacturers' 'possible care in preparation of product,' which is irrelevant to whether a product is unsafe or strict liability is established." (quoting *The Force Awakens*, 27 Widener Commonwealth L. Rev. at 210)).

[125] *See, e.g.*, *Cloud*, 2017 WL 3835602, at *2 (industry standards evidence is relevant, not dispositive); *Siems*, 2014 WL 4954068, at *3 (same).

[126] *The Force Awakens*, 27 Widener Commonwealth L. Rev. at 210 (analyzing a jury instruction about a "state of the art defense").

[127] *Tincher*, 104 A.3d at 387.

[128] *Id.* at 389.

[129] *Id.* at 335.

[130] 2017 WL 3835602, at *2.

[131] *Id.*

[132] *Id.*

[133] *See, e.g.*, *Palmer*, 2022 WL 1813848, at *9; *Dunlap*, 194 A.3d at 1076 (Lazarus, J., dissenting).

[134] ECF Doc. No. 60.

[135] *Id.* at 9.

[136] ECF Doc. No. 60 at 4.

[137] *Allstate Prop. & Cas. Ins. Co. v. Haier US Appliance Sols., Inc.*, No. 20-365, 2022 WL 906049, at *9 (M.D. Pa. Mar. 28, 2022) (quoting *Phillips v. A-Best Prods. Co.*, 665 A.2d 1167, 1171 (Pa. 1995)).

[138] *Flanagan v. martFIVE, LLC*, 259 F. Supp. 3d 316, 320 (W.D. Pa. 2017) (quoting *Coward v. Owens–Corning Fiberglas Corp.*, 729 A.2d 614, 620 (Pa. Super. Ct. 1999)).

[139] *Allstate*, 2022 WL 906049, at *9.

[140] *Flanagan*, 259 F. Supp. 3d at 321.

[141] *Id.* at 320 (quoting *Coward*, 729 A.2d at 621).

[142] *Conti v. Ford Motor Co.*, 743 F.2d 195, 199 (3d Cir. 1984).

[143] ECF Doc. No. 28 at 6.

[144] *Id.* at 7.

[145] *See Flanagan*, 259 F. Supp. 3d at 321 (admitting evidence plaintiffs "were in a hurry" and "chose" not to review instructions on a package)

[146] We question why Mr. Lehmann moves to exclude this evidence in the first place because he is proceeding under a failure-to-warn theory. It seems Mr. Lehmann ***must*** adduce evidence of what conduct the warnings would have changed to prevent the accident under his failure-to-warn theory. *See Conti v. Ford Motor Co.*, 743 F.2d 195, 199 (3d Cir. 1984). Yet Mr. Lehmann does not mention

his failure-to-warn theory in his Motion. We may address whether Mr. Lehmann is still proceeding under a failure-to-warn theory at our pre-trial conference.

[147] *Sullivan*, 253 A.3d at 738.

[148] *Rosenthal*, 484 F.3d at 253.

[149] *Sullivan*, 253 A.3d at 739 n.3 ("The jury determined the scaffold's warnings were defective but not a factual cause of Sullivan's injuries.").

[150] *Allstate*, 2022 WL 906049, at *9.

[151] ECF Doc. No. 35.

[152] ECF Doc. No. 67. Although the evidence sounds like industry standards evidence, neither party argues we should consider it industry standards evidence. We would admit the evidence even if categorized as industry standards evidence. *See supra* Part II.A.

[153] *Tincher*, 104 A.3d at 387.

[154] *Id.*

[155] *Id.* at 397.

[156] *Id.*

[157] ECF Doc. No. 37.

[158] ECF Doc. No. 37-6 at 8.

[159] ECF Doc. No. 64 at 2.

[160] Louisville Ladder also argues we should exclude references to hierarchy of safety because it is an industry standard. We do not exclude the evidence on this basis consistent with our discussion above. *See supra* Part II.A.

[161] Fed. R. Evid. 403.

[162] *United States v. Cunningham*, 694 F.3d 372, 387 (3d Cir. 2012).

[163] ECF Doc. No. 64 at 4–5.

[164] ECF Doc. No. 64 at 6.

[165] Mr. Lehmann argues we cannot consider Louisville Ladder's motion to exclude the hierarchy of safety evidence because it is a *Daubert* motion in disguise and Louisville Ladder missed our

deadline for filing motions *in limine*. We disagree. A *Daubert* motion is a subset of the motion *in limine*, which challenges evidence. We enjoy broad discretion to manage trial and make evidentiary rulings. *See* Fed. R. Evid. 611. We will not admit inadmissible evidence simply because a party missed its deadline for *Daubert* motions. We provided Mr. Lehmann ample time to respond to the motion, and he does not argue prejudice in our considering this motion.

[166] ECF Doc. No. 39.

[167] *Barker v. Deere & Co.*, 60 F.3d 158, 162 (3d Cir. 1995).

[168] *Id.*

[169] *See, e.g.*, *Jackson v. Louisville Ladder, Inc.*, No. 11-1527, 2014 WL 460849, at *5 (M.D. Pa. Feb. 5, 2014) ("The Court in *Barker* was clear that other accident evidence that did not meet the 'substantially similar' standard should have been excluded as irrelevant.").

[170] *Sikkelee v. Precision Airmotive Corp.*, 522 F. Supp. 3d 120, 150 (M.D. Pa. 2021).

[171] *See Sullivan*, 253 A.3d at 739.

[172] *Nicholas Kauten v. Louisville Ladder Inc., et al.*, No. 20JE-CC223 (Cir. Ct. Jefferson Cnty. Mo. 2020).

[173] *Juan Charez v. Louisville Ladder, Inc., at al.*, No. 56-2016-485366 (Sup. Ct. Ventura Cnty. Cal. 2016).

[174] *Hutchinson v. Penske Truck Leasing Co.*, 876 A.2d 978, 983 (Pa. Super. Ct. 2005), *aff'd*, 922 A.2d 890 (Pa. 2007); *see also Jackson*, 2014 WL 460849, at *4 (excluding previous accident evidence involving similar but different product).

[175] *See* ECF Doc. No. 65-1 ¶¶ 13–14.

[176] ECF Doc. No. 65-2 at 6.

[177] ECF Doc. No. 39-9 at 8.

[178] *See* Fed. R. Evid. 602.

[179] ECF Doc. No. 65-4 at 3.

[180] *See, e.g.*, *Fitzpatrick v. Nat'l Mobile Television*, 364 F. Supp. 2d 483, 495 (M.D. Pa. 2005) (excluding testimony it "was common knowledge" someone had been in several accidents because "the 'common knowledge' could be hearsay"); *see also* Comment to Fed. R. Evid. 602 ("This rule would, however, prevent him from testifying to the subject matter of the hearsay statement, as he has no personal knowledge of it.").

---

[181] ECF Doc. No. 61.

[182] 424 F.3d at 358.

[183] *Id.* at 357.

[184] *Id.* at 358.

[185] ECF Doc. No. 69 at 5.

[186] Policies and Procedures at 12, available at https://www.paed.uscourts.gov/documents/procedures/keapol.pdf

[187] *See* ECF Doc. No. 61 at 8.

[188] We understand our Court of Appeals decided *Forrest* during *Azzarello*'s regime. *Azzarello* contributed to some of our Court of Appeals's concerns: for example, our Court of Appeals noted evidence about the absence of previous accidents could "lead the jury towards forbidden inferences" involving negligence principles. *Forrest*, 424 F.3d at 361. But *Azzarello*-related concerns comprised only some of Court of Appeals's reasoning in crafting its special Rule 403 test for absence of previous accidents. Our Court of Appeals's reasoning is not extinguished because *Azzarello* is extinguished; our Court of Appeals's cited concerns exist irrespective of *Azzarello*.